UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

JEANNE M. SULLIVAN,
          Plaintiff,

against

DAVID J. SULLIVAN,
          Defendant

Case No. 302 CV 916 (CFD)

MARCH 4, 2004

---

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PREJUDGMENT REMEDY

The Defendant, David J. Sullivan, hereby submits this Memorandum in Opposition to the Motion for Prejudgment Remedy of October 10, 2003, on which an evidentiary hearing was held on February 27, 2004.

### FACTS ADDUCED RE: BACKGROUND

1.     James J. Sullivan, who died November 14, 1990, and the Plaintiff, Jeanne M. Sullivan, were husband and wife and the parents of a number of children, including James J. Sullivan, Jr., Suzanne Xanthos, and the Defendant, David J. Sullivan.

2.     During the entire time period in question, the Defendant, David J. Sullivan, resided in Bermuda while his parents resided in Sharon, Connecticut. Notwithstanding this fact, the Plaintiff, Jeanne M. Sullivan, maintained a bank account in Bermuda. (Exhibit 7).

3. Between November 14, 1990 when James J. Sullivan died, and approximately August 31, 2001 when Jeanne M. Sullivan with the assistance of Suzanne Xanthos terminated a power of attorney in favor of David J. Sullivan, David J. Sullivan assisted to some degree Jeanne M. Sullivan with regard to her financial transactions. Although Mr. Lefevre quoted David J. Sullivan as characterizing himself as a trusted financial advisor, Mr. Lefevre also conceded that David J. Sullivan characterized himself as a "bag man" relative to transporting his parents' money between Sharon, Connecticut and Bermuda, and additionally indicated to Mr. Lefevre that he simply carried out his mother's directions with regard to her financial affairs.

4. Shortly after the death of James J. Sullivan, Jeanne M. Sullivan executed a power of attorney in favor of David J. Sullivan, which power of attorney was renewed on a number of occasions between 1991 and 2001. In February 2001, Jeanne M. Sullivan suffered a minor stroke. In April 2001, Jeanne M. Sullivan suffered a major stroke. On August 30, 2001, within a few months of her major stroke, Jeanne M. Sullivan revoked the power of attorney in favor of David J. Sullivan, and executed a power of attorney in favor of Suzanne Xanthos. (Exhibits 24, 25)

5. David J. Sullivan related to Mr. Lefevre that on September 29, 2001, after learning of the revocation of his power of attorney, David J. Sullivan and James J. Sullivan, Jr. met with Jeanne M. Sullivan. She indicated on that occasion that she had never intended to revoke the power of attorney in favor of David J. Sullivan, and never

had intended to empower Suzanne Xanthos to handle her financial affairs. James J. Sullivan, Jr. verified the accuracy of what transpired at the foregoing meeting to Mr. Lefevre.

    6.    In light the foregoing, James J. Sullivan, Jr. petitioned the Torrington Probate Court for the appointment of a neutral conservator for the Estate of Jeanne M. Sullivan. Suzanne Xanthos opposed this appointment. David J. Sullivan did not. The Torrington Probate Court appointed Mr. Lefevre conservator in June of 2002 over the objection of Suzanne Xanthos, and surcharged Suzanne Xanthos approximately $9,000.00 for having utilized funds in her mother's estate pursuant to her power of attorney to oppose the appointment of Mr. Lefevre.

    7.    Shortly before the powers Suzanne Xanthos had pursuant to her power of attorney were terminated by the appointment of Mr. Lefevre as conservator for the Estate of Jeanne M. Sullivan, Suzanne Xanthos caused the filing of the within action. After the appointment of Mr. Lefevre, Suzanne Xanthos provided Mr. Lefevre substantial information in support of this claim.[1] Thereafter, Mr. Lefevre, with the blessing of the Torrington Probate Court, elected to continue to pursue this claim.

---

[1] Interestingly, Mr. Lefevre admitted there was evidence Suzanne Xanthos defaulted on a loan payable to her father for acquisition of her home in Sharon. There was evidence that Ms. Xanthos owed $500.00 per month from about June 1991 through about September 2011, which remains unpaid. Mr. Lefevre has not pursued collection of this sum, or even questioned Suzanne Xanthos as to why it remains unpaid. The sum involved exceeds $100,000.00.

## FACTS RE: CONTEXT OF SPECIFIC CLAIMS

1.      During the lifetime of James J. Sullivan, and from the date of his death through the date Jeanne M. Sullivan first suffered a stroke in early 2001, there was no evidence that either James J. Sullivan or Jeanne M. Sullivan ever questioned the conduct of, or claimed to anyone that David J. Sullivan had in any fashion misappropriated funds, failed to carryout their instructions relative to their financial matters, or had done anything improper relative to the transactions in which David J. Sullivan might have been involved.

2.      During this period of time, the evidence was that bank statements, financial records, and any other information relative to the financial transactions of Jeanne M. Sullivan up until the date of her first stroke in February 2001, were forwarded directly to Jeanne M. Sullivan and not to David J. Sullivan.

3.      Despite the fact that David J. Sullivan held a power of attorney from 1991 through August 30, 2001, there was no evidence adduced that at any time he utilized the power of attorney on behalf of his mother; that he executed any documents in his capacity as a power of attorney; or that he undertook any transaction at the direction of his mother, which transaction was purported to be for the benefit of his mother. Nor were there any documents introduced into evidence that either contain directions from his father or mother as to how he was to act on their behalf, or any documents that

4

indicated David J. Sullivan purported to act on behalf of his father or mother pursuant to any power of attorney.

4.    There was uncontradicted evidence that James J. Sullivan and Jeanne M. Sullivan had, for reasons of their own, directed that their funds be commingled with David J. Sullivan's funds, even prior to the death of James J. Sullivan. For example, Mr. Lefevre acknowledged that Suzanne Xanthos had obtained a loan from James J. Sullivan prior to his death for her acquisition of a home in Sharon, Connecticut. The loan required repayment of $500 per month. James J. Sullivan directed that Suzanne Xanthos pay the $500 per month to David J. Sullivan. The sole evidence Mr. Lefevre had as to the rightful owner of that loan was provided by David J. Sullivan and James J. Sullivan, Jr., both of whom told Mr. Lefevre that the loan was rightfully owned by James J. Sullivan and Jeanne M. Sullivan, and its balance was payable to Jeanne M. Sullivan at $500 per month through approximately September of 2011. Another example was that although Mr. Lefevre could not recognize documentation relative to the transfer of Herley stock, he acknowledged that it was possible upon further review that he would conclude that the Herley stock that had been sold in 1994 and 1995 for approximately $454,443.00 was not in the names of James J. Sullivan and/or Jeanne M. Sullivan as claimed by Mr. Lefevre in an exhibit introduced at the prejudgment remedy hearing, but instead had been transferred in 1990 before James J. Sullivan's death by him to David J. Sullivan. (Exhibit 22).

5.   Mr. Lefevre acknowledged that after a comprehensive review of the Sullivan financial records dating back some 15 years that he could conclude the Sullivans did not memorialize their intra-family transactions with any kind of formality. Mr. Lefevre mentioned in this regard that although there was evidence of a substantial loan to Suzanne Xanthos for the acquisition of her house, that there was no mortgage recorded on the land records, and no evidence of a formal note. Mr. Lefevre also acknowledged in this regard that assets of James J. Sullivan, such as stock owned at the time of his death, and bank accounts in his name, were left in his name years subsequent to his death. There was no evidence as to why these events occurred. There was simply evidence that they did occur.

6.   Mr. Lefevre testified based on his examination of tax returns dating back to prior to the death of James J. Sullivan that the Sullivan family at no time filed gift returns, which Mr. Lefevre maintained was evidence that Jeanne M. Sullivan never intended to financially benefit any of her children, including David J. Sullivan. However, it was undisputed that in 1998, Jeanne M. Sullivan sold a parcel of real property improved by a home in Pound Ridge, New York, which was listed for sale at $490,000.00, to a grandson for the price of $165,000.00. There was no claim by Mr. Lefevre that this transaction was improper. The financial benefit received by her grandson as a result of this transaction was approximately $300,000.00. Clearly, Jeanne M. Sullivan did on occasion financially benefit family members.

7.      There was no evidence introduced as to the mental competency or financial savvy of either James J. Sullivan or Jeanne M. Sullivan up until the date of Jeanne M. Sullivan's first stroke in early 2001. As far as Mr. Lefevre knew, Jeanne M. Sullivan was competent to handle her daily affairs, and did so. There was no evidence of diminished capacity or an inability to understand her own affairs prior to the date of the first stroke.

## FACTS RE: SPECIFIC CLAIMS

1.      Mr. Lefevre identified seven checks he claimed were drawn on Jeanne M. Sullivan's account and deposited into David J. Sullivan's account in Bermuda. (Exhibit 6). Reference to the checks will indicate that a $250,000.00 check was drawn in 1996, a $250,000.00 check was drawn in 1997, and five $20,000.00 checks were drawn on the same date in April of 2000, thereby making a total withdrawal of $100,000.00. With regard to these checks, each was a cashier's check; each would have had to be obtained by Jeanne M. Sullivan going to the bank to request such check; and those checks that were endorsed were endorsed by Jeanne M. Sullivan, and presumably delivered to David J. Sullivan. There was no evidence adduced as to the circumstances of any of these transactions; what either Jeanne M. Sullivan or David J. Sullivan said with regard to these transactions; or that anything wrongful occurred with regard to these transactions. There was no evidence that David J. Sullivan utilized his power of attorney with regard to obtaining these checks, or that he had any involvement

whatsoever in the decision of Jeanne M. Sullivan to draw these checks against her account and deliver them to David J. Sullivan for deposit in his account. Furthermore, at the time each of these checks were drawn, Jeanne M. Sullivan was receiving her bank statements directly at her home, and would have seen these significant withdrawals against her account. There was no evidence that she ever complained to anyone that anything improper had occurred with regard to any of these transactions.

2.  Mr. Lefevre claimed that in April of 2000 Corner Realty, Inc., an entity in which Jeanne M. Sullivan held an investment interest, issued a check to Jeanne M. Sullivan in the sum of $93,256.76, which check was deposited into an account solely in the name of Jeanne M. Sullivan and situated in Bermuda. (Exhibit 7). Mr. Lefevre then testified that bank records from Jeanne M. Sullivan's account indicate that $90,000.00 was withdrawn from her account approximately 9 days after the initial deposit. The withdrawal slip, by Mr. Lefevre's own admission, was not signed either by Jeanne M. Sullivan or anyone purporting to act on her behalf. There was no evidence that David J. Sullivan had anything to do with this transaction. There was no evidence David J. Sullivan received the money withdrawn from the account. There was no evidence that Jeanne M. Sullivan ever made complaint about this transaction, despite the fact that she was competent and reviewing her own records relative to her financial transactions at that time. There was nothing to substantiate Mr. Lefevre's claim that David J. Sullivan was benefited in any fashion by this transaction other than Mr. Lefevre's "suspicion" in

8

that regard. Finally, there was no evidence that David J. Sullivan utilized a power of attorney or acted in any other fiduciary capacity on behalf of Jeanne M. Sullivan relative to this transaction.

       3.     Mr. Lefevre next claimed, relying on information received from a brokerage house, the records for which were not produced at the prejudgment remedy hearing, that David J. Sullivan was somehow liable to Jeanne M. Sullivan for the 1994 and 1995 sale of shares of Herley Industries stock, which were sold at that time for $454,443.00. (Exhibit 22). There was no evidence adduced at the hearing as to the rightful owner of the stock sold. There were no stock certificates introduced, or records introduced relative to the sale of such stock. Nor was there any evidence produced that the proceeds of the sale of that stock ever were received by David J. Sullivan. Although Mr. Lefevre indicated he would need more time to review documents that were presented to him at the hearing as to the possibility that James J. Sullivan had transferred the Herley stock to David J. Sullivan prior to the death of James J. Sullivan, Mr. Lefevre opined, without any evidence to support the claim that if the Herley stock were transferred to David J. Sullivan prior to the death of James J. Sullivan, that such sale was part of a "conspiracy" and that David J. Sullivan held such stock not for his own benefit, but somehow for the benefit of Jeanne M. Sullivan. Mr. Lefevre acknowledged he was aware of the contents of no communications between James J. Sullivan and David J. Sullivan relative to the transfer of the stock, had discovered no

9

trust agreement relative to the transfer of the stock, and had not even discovered an informal letter or other written notation of any kind providing directions or terms for the transfer of the stock if it in fact was transferred from James J. Sullivan to David J. Sullivan prior to the death of James J. Sullivan. Finally, there was no evidence that either James J. Sullivan or Jeanne M. Sullivan ever questioned David J. Sullivan's conduct relative to the Herely stock, or made a claim that he had somehow misappropriated that stock from either of them for his own use.

4.  Mr. Lefevre then claimed that David J. Sullivan had wrongfully appropriated proceeds from the sale of Varian stock. No documents were produced in support of this claim. Mr. Lefevre claimed, however, that unproduced dividend stubs and 1099 forms received by Jeanne M. Sullivan had indicated that Varian stock was held in the name of James J. Sullivan from his date of death through approximately 2000. Mr. Lefevre claimed that Jeanne M. Sullivan presumably received and definitively paid income tax on dividends received from the Varian stock from 1990 through 1999 as reflected on her unproduced federal income tax returns for those years. Mr. Lefevre claimed that dividends on the Varian stock were not received by or reported as income by Jeanne M. Sullivan subsequent to 1999. Mr. Lefevre claimed that when he questioned David J. Sullivan relative to the Varian stock, David J. Sullivan acknowledged that he had purchased the stock in early 2000 for the price at which it traded as of December 1999, and had paid his mother in cash, in full, for the stock in

early 2000. That Jeanne M. Sullivan dealt in cash was clear by the fact that after her incapacity in 2001 when her safe deposit box was opened, it contained $40,000.00 in cash and numerous $9,000.00 checks written to the order of Jeanne M. Sullivan that she could cash when she wished to obtain additional cash. David J. Sullivan acknowledged that the contents of the safe deposit box were his mother's, that he made no claim to the assets therein, and that he held the assets in a safe deposit box in his own name only because of his mother's desire that he hold her belongings for safekeeping after her strokes in 2001, so as to protect assets she otherwise would keep at the house from healthcare workers who may have worked with her at that time. Notwithstanding the foregoing, Mr. Lefevre concluded that if David J. Sullivan purchased the Varian stock, he did not provide cash to his mother for its purchase because he could not find evidence of a substantial deposit in her bank accounts at that time, and the sale of the stock was not included on her unproduced tax return as a capital gain for tax year 2000. If the stock was rightfully owned by Jeanne M. Sullivan as claimed by Mr. Lefevre, and if the stock was in the name of James J. Sullivan, her former husband, Mr. Lefevre had the ability to procure the records that would either show or fail to show the sale of the Varian stock at the price claimed by David J. Sullivan. Mr. Lefevre did not do so. No stock certificates were produced. No records of sale were produced. No records of dividends were produced. Instead, Mr. Lefevre produced one document (Exhibit 11) in support of his contention that there were

documents at odds with David J. Sullivan's explanation as to how the stock had been acquired. The Court, upon review of this exhibit indicated it had no probative worth relative to Mr. Lefevre's claim in this regard. Mr. Lefevre also could not identify the number of shares of Varian stock to which he theory applied, or the value of the stock at the time of its alleged conversion. Nor did Mr. Lefevre produce any records relative to its subsequent sale, if it in fact was converted. Instead, Mr. Lefevre estimated that the loss to Jeanne M. Sullivan based on the foregoing was $30,000.00 to $60,000.00.

5.  Mr. Lefevre next claimed that his examination of the records of Jeanne M. Sullivan indicated that she had lost another $742,000.00, which he characterized as "unaccounted for transactions". There were no records produced in support of this claim, and Mr. Lefevre readily acknowledged under cross-examination that as of the date of the prejudgment remedy hearing, he had no evidence that David J. Sullivan had benefited in any fashion from these transactions. He maintained that he needed to review records he had not yet reviewed in order to ascertain whether claims existed against David J. Sullivan relative to these monies. In addition to producing no records relative to this claim, Mr. Lefevre introduced no oral testimony as to the specific events that constituted the "unaccounted for transactions", or the time periods during which they allegedly occurred.

6.  Mr. Lefevre's final claim consisted of a number of very small transactions of a miscellaneous nature. First, he claimed that a dividend check payable to the order

of Jeanne M. Sullivan and drawn on Corner Realty, Inc. on or about August 8, 2001, (Exhibit 8) was misappropriated by David J. Sullivan by virtue of its deposit into his account in Bermuda subsequent to that date. He produced no evidence in support of his claim of misappropriation other than his claim that Jeanne M. Sullivan was of a diminished capacity in August of 2001 by virtue of her two prior strokes. However, Mr. Lefevre testified that Jeanne M. Sullivan was fully competent 22 days after issuance of that check when she terminated the power of attorney of David J. Sullivan and executed a power of attorney in favor of Suzanne Xanthos. Accordingly, there was no credible evidence presented by Mr. Lefevre that Jeanne M. Sullivan was incapable of delivering a dividend check to her son in August of 2001 if she desired to do so. No evidence was presented relative to the circumstances under which the check came to be in David J. Sullivan's account. Again, Mr. Lefevre "suspected" inappropriate conduct on David J. Sullivan's behalf. Second, Mr. Lefevre claimed that David Sullivan improperly obtained a virtually illegible check payable to David J. Sullivan in the sum of $9,000.00. (Exhibit 13). The back of this check was not even introduced into evidence. The claim of misappropriation was premised on the inability of Jeanne M. Sullivan to sign the check given the date of the check and her physical condition on that date. However, the date of the check is illegible and despite the fact that Mr. Lefevre conceded that an expert in forgeries had been retained to examine all of the records, no evidence was adduced from this expert in support of a claim that either the signature of Jeanne M. Sullivan as

the maker of the check, or any possible endorsement of the check was a forgery. As was the case of many of Mr. Lefevre's claims, he in essence claimed that the mere existence of this instrument justified an inference that David J. Sullivan had misappropriated his mother's funds. Third, Mr. Lefevre claimed that a November 11, 1998 check drawn on the account of James J. Sullivan (approximately 8 years after his death) and payable to the order of D. J. Sullivan was proof of a misappropriation on behalf of David J. Sullivan. There was no evidence introduced as to the circumstances under which this check was created, and specifically no evidence as to who affixed the signature James J. Sullivan as its maker. Again, although a handwriting expert had been retained in this case, no handwriting expert was produced to testify as to whose signature this might be. The Court would have to engage in pure speculation, as did Mr. Lefevre, to conclude that David J. Sullivan rather than Jeanne M. Sullivan affixed the signature of James J. Sullivan to this check. There was simply no proof that David J. Sullivan did anything inappropriate relative to the creation of this check, the existence of which 8 years after the death of James J. Sullivan was consistent with the practice of Jeanne M. Sullivan not to transfer assets from the name of her husband to her own name subsequent to her husband's death, notwithstanding her ownership of such assets.

FACTS RE: CORROBORATING EVIDENCE

1.   Mr. Lefevre, perhaps sensing that he had no direct proof of David J. Sullivan's involvement in the claimed transactions, attempted to prove indirectly what he could not prove directly. For example, he claimed that David J. Sullivan's use of the word "esquire" was an attempt to surreptitiously threaten lending institutions with the claim that David J. Sullivan was a lawyer, when he in fact was not. (Exhibits 16, 18). However, Mr. Lefevre admitted under cross-examination that David J. Sullivan was a British subject who resided in Bermuda where use of the term "esquire" is common, not for attorneys, but for landowners.

2.   Mr. Lefevre suggested that David J. Sullivan's writing to financial institutions suggesting that they not honor the power of attorney obtained in August of 2001 by Suzanne Xanthos was evidence of his admitted wrongdoing relative to his mother's financial transactions. (Exhibits 16, 17, 18). However, Mr. Lefevre conceded that both David J. Sullivan and James J. Sullivan, Jr. claimed that Jeanne M. Sullivan had indicated on September 29, 2001 that she had never intended to revoke the power of attorney she had held in favor of David J. Sullivan for the prior 10 years, and did not intend to empower Suzanne Xanthos to act on her behalf. In light of the comments of Jeanne M. Sullivan on September 29, 2001, David J. Sullivan was acting prudently to warn third parties to question the legality of the power of attorney obtained by Suzanne Xanthos on August 30, 2001.

3.   Mr. Lefevre suggested that as late as August 22, 2002, David J. Sullivan continued to write financial institutions relative to his mother's accounts by purportedly forging her signature on the letter of inquiry. (Exhibit 15). This, however, was a dubious claim. Although Mr. Lefevre had hired a handwriting expert, he introduced no evidence through that expert that David J. Sullivan had forged his mother's signature on the letter of August 22, 2002. Mr. Lefevre also acknowledged that Suzanne Xanthos had when she had been given power of attorney in August of 2001 immediately undertaken to insure that all the statements relative to her mother's accounts had been mailed to her as opposed to David J. Sullivan where the statements had previously been sent. Mr. Lefevre could not explain how David J. Sullivan would have a copy of his mother's account statement in August 2002, approximately one year after Ms. Xanthos had obtained a power of attorney from her mother. Finally, Mr. Lefevre offered no evidence as to why David J. Sullivan would question a $150.00 charge against his mother's account on July 29, 2002 or how if he questioned such charge that in any way tended to prove he had misappropriated his mother's assets years prior to the date of this letter.

I.   **STANDARD AND SCOPE OF REVIEW**

Review of the Motion for Prejudgment Remedy of October 10, 2003 will reveal that its sole authority is *Connecticut General Statutes* §52-278a, et. seq.[2] The remedy

---

[2] Although the motion is entitled "Motion for Injunction and for Prejudgment Remedy", and although the motion purports to be additionally authorized by Rule 65 of the Federal Rules of Civil Procedure entitled "Injunctions", by order dated December 12, 2003 by

16

of attaching and securing a Defendant's property to satisfy a judgment which the Plaintiff may recover is unknown to the common law and is founded on and required by our statutory law. *Ledgebrook Condominium Association, Inc. v. Lusk Corporation*, 172 Conn. 577, 582 (1977). No prejudgment remedy is available to a person in any action unless that person has complied with the provisions of General Statutes §52-278a through §52-278g, which provisions govern prejudgment remedies. *Essex Group, Inc. v. Ducci Electric Company, Inc.*, 181 Conn. 524, 525 (1980).

*Connecticut General Statutes* §52-278d(a) provides that the hearing on a prejudgment remedy shall be limited to a determination of whether or not there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of prejudgment remedy sought, taking into account any defenses or set offs, will be rendered in the matter in favor of the Plaintiff. The court in deciding whether to grant a prejudgment remedy must consider viable defenses to the claim whether or not such defenses have actually been pleaded by the date of the prejudgment remedy hearing. *Rafferty v. Noto Brothers Construction, LLC*, 68 Conn. App. 685, 690-693 (2002).

---

United States Magistrate Judge Thomas P. Smith, to the extent the motion of October 102, 2003 sought a preliminary injunction, Magistrate Judge Smith recommended that it be denied without prejudice. The Plaintiff did not thereafter seek review of the Magistrate Judge's order, nor did the plaintiff re-file any motion seeking the remedy of a temporary injunction.

The Connecticut Supreme Court has clearly articulated the test for the issuance of a prejudgment remedy.

> Pursuant to our prejudgment remedy statutes, General Statutes §52-278a et seq., the trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits. *New England Land Co. v. DeMarkey*, 213 Conn. 612, 620-21, 569 A.2d 1098 (1990). The hearing in probable cause for the issuance of a prejudgment remedy is not contemplated to be a full scale trial on the merits of the plaintiff's claim. The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim... The court's role in such a hearing is to determine probable success by weighing probabilities. *Id.* at 620. Moreover, this weighing process applies to both legal and factual issues. *Augeri v. C. F. Wooding Co.*, 173 Conn. 426, 429, 378 A.2d 538 (1977); *Babiarz v. Hartford Special, Inc.*, 2 Conn. App. 388, 393, 480 A.2d. 561 (1984).

*Bank of Boston Connecticut v. Schlesinger*, 220 Conn.152, 156 (1991).

Probable cause for the purpose of the prejudgment remedy statutes is a flexible, common sense standard that does not demand that a belief be correct or more likely true than false. *Goodwin v. Pratt*, 10 Conn. App. 618 (1987). Civil probable cause constitutes a bonafide belief in the existence of the facts essential under the law for the action, and such as would warrant a person of ordinary caution, prudence and judgment under the circumstances in advancing the action. *One Fawcett Place Ltd. Partnership v. Diamandis Communications, Inc.* 24 Conn. App. 524, 525 (1991).

With regard to damages within the context of a prejudgment remedy, the amount of damages need not be determined with mathematical precision. *Burkert v. Petrol Plus*